**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| DONALD R. SIMON,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 5:23-CV-0013-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Donald R. Simon ("Plaintiff" or "Mr. Simon") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.        Procedural History

Mr. Simon filed his SSI application on October 13, 2020, alleging a disability onset date on the same day.[1]  (Tr. 111-14, 116-19, 124-25.)  He asserted disability due to diabetes, chronic pain, anxiety, depression, degenerative joint disease, agoraphobia, social anxiety, hernia, sciatica, peripheral neuropathy.  (Tr. 89, 99.)  Mr. Simon's application was denied at the initial level (Tr. 115-19) and upon reconsideration (Tr. 124-25).  He then requested a hearing.  (Tr. 126.)

---

[1] Mr. Simon filed a prior application for SSI, alleging a disability onset date of June 15, 2017, but an administrative law judge issued an unfavorable decision on April 10, 2019.  (Tr. 60-77.)

1

A telephonic hearing was held before an Administrative Law Judge ("ALJ") on January 7, 2022. (Tr. 42-65.) The ALJ issued an unfavorable opinion on January 21, 2022. (Tr. 7-19.) Mr. Simon's request for review of the decision by the Appeals Council was denied on December 14, 2022, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.) Mr. Simon timely filed a Complaint seeking judicial review. (ECF Doc. 1.) The case is fully briefed and ripe for review. (ECF Docs. 11, 14, 15.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Simon was born in 1969 and was 50 years old on the alleged disability onset date, making him an individual closely approaching advanced age under Social Security regulations. (Tr. 18.) He had a limited education. (*Id*.) Mr. Simon had not engaged in substantial gainful activity since the alleged onset of disability date. (Tr. 12.)

### B. Medical Evidence

#### 1. Treatment Prior to Alleged Onset Date

##### i. Physical Impairments

Mr. Simon saw primary care provider Amy Westfall, CNP, at AxessPointe on January 3, 2019, for a pulled neck and right shoulder. (Tr. 377-78.) He requested x-rays. (Tr. 377.) Physical examination findings were unremarkable. (Tr. 378.) CNP Westfall ordered neck and shoulder x-rays. (Tr. 377.) At a follow-up in February 2019, Mr. Simon reported continued neck and shoulder pain, especially when pushing or carrying. (Tr. 371-73.) Physical examination findings remained unremarkable and the neck and shoulder x-rays were negative. (*Id*.) Mr. Simon declined physical therapy or a referral to orthopedics, and CNP Westfall prescribed methocarbamol and naproxen for neck pain. (Tr. 372-73.)

At an appointment on March 21, 2019, Mr. Simon told CNP Westfall he would like to start taking gabapentin again for his pain and restless leg syndrome ("RLS").  (Tr. 366-68.)  His physical examination findings remained unremarkable.  (Tr. 367-68.)  CNP Westfall added a diagnosis of peripheral neuropathy and restarted gabapentin.  (Tr. 367.)  At a follow up in April 2019, Mr. Simon reported that gabapentin was helping with his pain and with his legs at night, and CNP Westfall increased his dosage.  (Tr. 363-65.)  Physical examination findings remained unremarkable.  (Tr. 364-65.)  Mr. Simon reported that his disability application had been denied, and that his back was hurting even more because he had to walk everywhere after the courts took his father's car away.  (Tr. 364.)

Mr. Simon attended six physical therapy ("PT") sessions at Drayer Physical Therapy Institute from May 31 through June 13, 2019, for chronic neck and back pain.  (Tr. 275-94.)  Mr. Simon complained decreased function and activities of daily activities, difficulty dressing, difficulty standing, weakness, and loss of motion.  (Tr. 290.)  Joseph Booth, PT, observed that: the session was short due to Mr. Simon's reported anxiety; Mr. Simon did not like to be touched; and Mr. Simon tolerated treatment well.  (*Id*.)  PT Booth assessed Mr. Simon's range of motion but was unable to perform a manual muscle test "secondary to [Mr. Simon's] request not to be touched."  (Tr. 291-92.)  He indicated that Mr. Simon's signs and symptoms were consistent with cervical and lumbar radiculopathy, and that his impairments included: "weakness, decreased AROM." (Tr. 292.)  He assessed Mr. Simon's case as "moderate complexity" and advised two sessions a week for six weeks.  (*Id*.)   Mr. Simon discontinued PT after six sessions on June 13, 2019, saying it increased his back pain and other issues.  (Tr. 275.)

Mr. Simon returned to see CNP Westfall on July 30, 2019, complaining of a facial rash as a side effect of gabapentin.  (Tr. 350-52.)  CNP Westfall advised him to wean off of gabapentin

for his sciatica and started ropinirole for his RLS.  (Tr. 350.)  Ropinirole was increased at a follow up appointment in August 2019.  (Tr. 347-48.)  Physical examination findings were unremarkable at both appointments.  (Tr. 348, 351.)

Mr. Simon initiated care with family medicine doctor Vikil K. Girdhar, M.D., at AxessPointe on October 5, 2019.  (Tr. 339-40.)  At a follow up in November 2019, Mr. Simon complained of neuropathy with sciatica and pain in his neck and legs, rating his pain at 9/10, and requested a refill of naproxen for pain control.  (Tr. 336.)  On examination, Dr. Girdhar noted myofascial tenderness of the spine with mild limitation secondary to pain, and noted that Mr. Simon was ambulating without an assistive device but with a slightly hunched over posture.  (Tr. 337.)  Dr. Girdhar diagnosed degenerative joint disease and restarted naproxen.  (*Id*.)

Mr. Simon returned to CNP Westfall for blood work in January 2020, and reported that he would like to retry gabapentin; he had thought that gabapentin caused a facial rash, but later came to believe the rash was caused by Zoloft.  (Tr. 328-31.)  In February 2020, he reported that he was doing well on gabapentin for his sciatica; he had also stopped ropinirole for his RLS because gabapentin also helped with that condition.  (Tr. 323-25.)  Physical examination findings remained unremarkable.  (Tr. 323-24.)

At a three-month follow up in July 2020, CNP Westfall refilled Mr. Simon's gabapentin, methocarbamol, and naproxen for peripheral neuropathy and degenerative disc disease.  (Tr. 307-10.)  Mr. Simon returned for another three-month follow up on October 6, 2020, where CNP Westfall again continued his medications.  (Tr. 298-300.)  He noted that he had an appointment with pain management scheduled for the end of the month.  (Tr. 300.)  Physical examination findings at both visits were unremarkable.  (Tr. 299, 307-08.)

### ii.    Mental Impairments

Mr. Simon attended a counseling visit with Tracey Beresh, LISW, at AxessPointe on January 10, 2019.  (Tr. 375-76.)  He talked about life stressors that included his father being in hospice, an upcoming disability hearing, and not being able to work and earn a living due to health problems and increased social anxiety.  (Tr. 375.)  He said his goal was to get to where he could go grocery shopping without freaking out.  (*Id*.)  On examination, he was fully oriented, his affect and eye contact were appropriate, his attitude was cooperative, his thought content was logical and coherent, and his cognitive function, insight, judgment, memory, and thought processes were all intact.  (*Id.*)  However, his mood was depressed and anxious, he was fidgety, his thought content was dichotomous, and his thought processes were tangential.  (*Id.*)  LISW Beresh worked with Mr. Simon to complete a questionnaire for his disability hearing.  (*Id.*)

At a primary care appointment with CNP Westfall in April 2019, Mr. Simon complained of worsening depression since being denied disability, but declined further counseling.  (Tr. 363-65.)  His depression screening indicated "severe depression."  (Tr. 364.)  CNP Westfall increased Zoloft and recommended counseling.  (Tr. 363-64.)  In May, Mr. Simon reported his mood was a little better, but complained of problems with attention and social anxiety.  (Tr. 359-62.)  CNP Westfall increased Buspar for anxiety, continued hydroxyzine and Zoloft, and continued to recommend counseling.  (Tr. 359-60.)  In June, Mr. Simon reported his mood was the same and that he felt more depression than anxiety.  (Tr. 355.)  CNP Westfall increased Zoloft and continued Buspar and hydroxyzine.  (Tr. 355-58.)  She noted that Mr. Simon did not wish to participate in counseling, and that he said he felt better staying in his apartment.  (Tr. 355.)  In July, Mr. Simon reported no difference in his mood and said he did not want to leave the house, and that it added to his depression when he looked outside his window and saw all the people working and making money.  (Tr. 350-51.)  He also reported a panic attack when he had an

ultrasound.  (*Id.*)  He told CNP Westfall he did not want to see a counselor or psychiatrist.  (Tr. 351.)  His depression screening showed "moderate depression."  (*Id.*)  CNP Westfall continued Zoloft and added Seroquel.  (Tr. 350.)  Mr. Simon's mood had improved a little bit in August, and CNP Westfall increased Seroquel, but Mr. Simon continued to decline counseling or a referral to psychiatry.  (Tr. 347.)  In September, Mr. Simon reported that Seroquel made his RLS worse, so CNP Westfall decreased Seroquel, increased Buspar, and continued Zoloft.  (Tr. 344.)  Two weeks later, he felt a little better, and agreed to see Dr. Girdhar for more help with his mood.  (Tr. 341.)

Mr. Simon followed up with Dr. Girdhar on October 5, 2019, to address his mental health symptoms.  (Tr. 339-40.)  He complained of agoraphobia, hearing voices that said "you're being followed," and having vivid concerning dreams.  (Tr. 340.)  Dr. Girdhar continued Zoloft and Buspar for anxiety and depression, and added Risperdal and Prazosin for paranoid ideation.  (*Id.*)

Mr. Simon continued to see Dr. Girdhar about every four weeks for medication management.  On November 2, 2019, Mr. Simon did not note much improvement in his symptoms, and Dr. Girdhar increased Risperdal.  (Tr. 336.)  On November 27, Mr. Simon reported mildly improved symptoms with Risperdal but asked to discontinue prazosin because it exacerbated his RLS symptoms; Dr. Girdhar stopped prazosin.  (Tr. 334-35.)  On December 18, Mr. Simon reported fairly stable symptoms but increasing dry mouth; Dr. Girdhar stopped hydroxyzine.  (Tr. 332-33.)  On January 15, 2020, Mr. Simon reported fairly stable symptoms with Buspar and Zoloft, but had stopped Risperdal because of side effects, and complained of hearing intimidating voices; Dr. Girdhar increased Buspar and started Abilify.  (Tr. 326-27.)  On February 12, Mr. Simon reported having a panic attack when he felt someone was following him in a grocery store, but said he was able to calm himself down.  (Tr. 321.)  He was doing well on

Abilify but requested a dose increase, and was doing well on Buspar and Zoloft; Dr. Girdhar increased trazodone and Abilify. (*Id.*) On March 11, Mr. Simon reported improved mood, energy, and motivation, but requested an increased dose of Abilify for adequate symptom control; he was doing well on Buspar, trazodone, and Zoloft. (Tr. 316.) Dr. Girdhar increased Abilify. (Tr. 317.) On April 15, Mr. Simon reported stopping Buspar and Zoloft due to skin issues, which had since improved, but noted increased emotional lability. (Tr. 311.) Dr. Girdhar stopped Buspar and Zoloft and started Prozac. (Tr. 312.) On July 15, Mr. Simon complained of continued nightmares and a recent episode where he became angry when someone made close contact with his shopping cart at the store. (Tr. 305.) Dr. Girdhar increased Prozac and trazodone and continued Abilify. (Tr. 306.) On August 12, Mr. Simon reported improved mood and being less angry, and said his main issues came when he went outdoors in the daytime and into public; he took his cousin with him to help him maintain his composure when out in public. (Tr. 303.) Dr. Girdhar continued his medications. (Tr. 304.) On September 16, Mr. Simon reported that his medications seemed to be working, but his major stressor was going out. (Tr. 301.) Dr. Girdhar started propranolol and continued his other medications. (Tr. 302.)

At all of his mental health medication management appointments with Dr. Girdhar prior to the alleged onset date, Mr. Simon's mental status examination findings were unremarkable and his depression screens were sometimes positive for depression. (Tr. 302, 304, 306, 312, 316, 321, 326-27, 332-33, 334-35, 336-37, 339-40.) In a primary care appointment with CNP Westfall in February 2020, Mr. Simon's depression screening was unremarkable. (Tr. 323-24.)

### 2. Treatment After Alleged Onset Date

#### i. Physical Impairments

Mr. Simon initiated treatment with Donald C. Perrine, MD, at New Season Pain Medicine at the Summa Health Medical Group on October 29, 2020, complaining of chronic neck and low

back pain.  (Tr. 463-69.)  His physical examination findings were unremarkable, except pain

with lumbar range of motion, decreased sensation to the left lower leg and foot, pain to palpation

of the lower cervical spine, and positive Spurling's on the left.  (Tr. 467-68.)  Dr. Perrine

diagnosed lumbar and cervical radiculopathy.  (Tr. 468.)  He noted evidence of significant

degenerative disc disease and facet arthropathy on a prior x-ray, ordered MRIs of the cervical

and lumbar spines, and increased Mr. Simon's gabapentin dose.  (Tr. 469.)

A November 17, 2020 lumbar MRI revealed: a central and right paracentral disc

protrusion at L4-5 with displacement of the thecal sac and possibly the right L5 nerve root;

moderate canal stenosis at L4-5; mild bilateral foraminal stenosis, degenerative disc, endplate,

and facet changes at L5-S1; and moderate right and mild left foraminal stenosis at L5-S1.  (Tr.

416-17, 462.)

Mr. Simon attended a virtual pain management visit with Dr. Perrine on December 2,

2020, reporting that his pain had improved slightly since his last visit.  (Tr. 458-63.)  The lumbar

MRI results were reviewed, but Mr. Simon had not yet gotten the cervical MRI.  (*Id*.)  With

respect to low back pain, Dr. Perrine noted that evidence of a right paracentral disc bulge at L4-5

contacting the right L5 nerve root on the recent MRI correlated to reported radicular symptoms

in the right leg, but thought there may also be an element of facet-mediated pain.  (Tr. 462.)  Dr.

Perrine increased gabapentin and instructed Mr. Simon to return in two months.  (*Id.*)

Mr. Simon had his cervical MRI on December 9, 2020, which revealed: disc bulges at

C5-6 and C6-7; central canal stenosis at C5-6; and left lateral recess stenosis and left foraminal

encroachment at C6-7.  (Tr. 408-10, 456.)

Mr. Simon returned to pain management with Dr. Perrine on February 12, 2021, where he

reviewed his cervical MRI results.  (Tr. 451-57.)  Mr. Simon reported pain that radiated down his

left arm into his hand and low back pain that radiated down his right leg to his thigh and foot, causing occasional numbness and tingling in the left hand and weakness in his legs and arms bilaterally.  (Tr. 451.)  Physical examination findings were unremarkable.  (Tr. 454-55.)  As to neck pain, Dr. Perrine noted some left arm radicular symptoms in a C7 distribution with evidence of a disc protrusion causing significant left lateral recess and left foraminal stenosis at C6-7 on the recent MRI.  (Tr. 456.)  Mr. Simon reported his back and neck pain was about the same as last time, not quite adequately controlled, and a rash from gabapentin.  (*Id.*)  Dr. Perrine stopped gabapentin, started Lyrica, continued Robaxin and naproxen as needed, and encouraged regular exercise as tolerated.  (Tr. 457.)  He noted that Mr. Simon would be a candidate for epidural steroid injections if his pain continued not to be adequately controlled; Mr. Simon deferred.  (*Id.*).

At his next pain management appointment with Dr. Perrine on April 16, 2021 (Tr. 597-608), Mr. Simon reported that his pain had been "quite a bit better" with Lyrica but was still not quite adequately controlled (Tr. 598).  Physical examination findings showed a normal gait, full motor strength, intact upper and lower extremity sensation except for decreased sensation in the left lower leg and foot, full cervical range of motion, limited lumbar range of motion with pain, and pain to palpation to the right lumbar paraspinal and the lower cervical spine.  (Tr. 602-03.)  Dr. Perrine increased Lyrica, continued other medications, and continued to discuss the possibility of epidural steroid injections, which Mr. Simon continued to defer.  (Tr. 606.)

Mr. Simon returned to pain management on July 14, 2021 (Tr. 585-96), reporting his pain was worse because he stopped taking Lyrica when it caused a facial rash (Tr. 586).  His physical examination findings were unremarkable, except for decreased sensation in the left lower leg and foot, and pain to palpation of his lower cervical spine.  (Tr. 589-91.)  Dr. Perrine prescribed Topamax, continued Robaxin and naproxen, and discussed that Mr. Simon would be a candidate

9

for a cervical or lumbar epidural steroid injection, which Mr. Simon deferred.  (Tr. 594.)  On August 20, 2021 (Tr. 574-84), Mr. Simon reported that his pain was significantly improved with the addition of Topamax, which he was tolerating well (Tr. 575).  Physical examination findings were unremarkable except for decreased sensation in the left lower leg and foot.  (Tr. 578-79.)  Dr. Perrine continued his medications and recommended a follow up appointment in three months; he also continued to offer epidural injections, which Mr. Simon deferred.  (Tr. 582.)

At his next pain management appointment, on November 17, 2021 (Tr. 657-68), Mr. Simon reported that his pain was worse after he recently stopped naproxen due to stomach upset and recent kidney function results (Tr. 658).  Physical examination findings were unchanged.  (Tr. 662.)  Dr. Perrine continued Robaxin and Topamax, advised Mr. Simon to avoid naproxen and other oral NSAIDs due to concerns about renal function, and advised Mr. Simon that he could try Voltaren gel for pain as needed.  (Tr. 665.)  He also continued to note that Mr. Simon would be a candidate for epidural injections, but Mr. Simon deferred.  (*Id.*)

### ii.    Mental Impairments

Mr. Simon returned to Dr. Girdhar for medication management on October 21, 2020, reporting that his medications seemed to be working and he was feeling somewhat better; he noticed good improvement in the times he was able to go out in public with the initiation of propranolol, and asked if the frequency could be increased.  (Tr. 296.)  Dr. Girdhar increased propranolol and continued Abilify, Prozac, and trazodone.  (Tr. 297.)  At a November 18, 2020 telephonic visit, Mr. Simon reported that he seemed to have "hit a plateau," with mild improvement in his symptoms of anxiety and depression, but with his symptoms worsened "due to feelings of 'cabin fever' due to the ongoing pandemic[.]"  (Tr. 556.)  He had been advised that he might gain further benefit from seeing a psychiatrist, and requested a referral to Portage Path Behavioral Health ("PPBH") in Barberton.  (*Id.*)  Dr. Girdhar continued his medications and

made a psychiatry referral to PPBH for treatment of anxiety, depression, social anxiety, and agoraphobia.  (Tr. 557.)  Mr. Simon returned for another telephonic medication management visit on January 13, 2021, reporting that his medications were going well and he was better with the sunshine out; he continued to experience issues going out in public, but his symptoms were otherwise fairly stable.  (Tr. 554.)  He was taking a smaller dose of trazodone due to feeling overly drowsy and groggy.  (*Id.*)  Dr. Girdhar continued his medications.  (Tr. 555.)  At a February 10, 2021 telephonic visit, Mr. Simon reported that he was stable on his medications but continued to experience nightmares.  (Tr. 547.)  He had not heard back from the PPBH psychiatry referral, and was also interested in counseling.  (*Id.*)  Dr. Girdhar continued his medications and made another referral to PPBH, for psychiatry and counseling.  (Tr. 548.)

At a March 10, 2021 telehealth appointment with Dr. Girdhar, Mr. Simon reported good symptom control and requested medication refills.  (Tr. 545.)  He continued to report issues among crowds, but had been "able to make it outdoors and run errands/grocery shopping given the improved temperature[.]"  (*Id.*)  Dr. Girdhar continued his medications.  (Tr. 546.)  On April 7, Mr. Simon reported that his medications were going well except that trazodone was not helping his sleep and was making his legs jumpy.  (Tr. 634.)  He also reported a panic attack at an Easter gathering when extra guests showed up, but said he was otherwise doing fairly well with good control of symptoms.  (*Id.*)  Dr. Girdhar increased trazodone to its maximum dose and continued Mr. Simon's other medications.  (Tr. 635.)  On April 14, Mr. Simon reported continued difficulty with sleep despite the increase in trazodone, but said he was stable on all other medications with fair to moderate relief in anxiety and depression.  (Tr. 632.)  Dr. Girdhar stopped trazodone and started Ambien.  (Tr. 633.)  On May 14, Mr. Simon reported that he was doing well on his medications.  (Tr. 627.)  Although he felt down and opted not to go out in

11

public for a period of time the prior week, he attributed it to the persistent rainy weather; he was in good spirits with the improved weather.  (*Id.*)  His medications were continued.  (Tr. 628.)

Mr. Simon returned for his next medication management appointment with Dr. Girdhar four months later, on September 15, 2021.  (Tr. 621-22.)  He reported that social anxiety and agoraphobia continued to be bothersome.  (Tr. 621.)  He reported freezing up and being unable to move at a Memorial Day gathering where an "excessive amount of people" was invited, and reported a similar incident in Walmart.  (*Id.*)  He requested medication refills, but was agreeable to a referral to PPBH for counseling and/or medication management.  (*Id.*)  He also reported no significant improvement in his insomnia with Ambien, and asked to go back on trazodone.  (*Id.*)  Dr. Girdhar refilled Abilify, propranolol, and Prozac, stopped Ambien, started trazodone, and made a referral to PPBH.[2]  (Tr. 621-22.)  Mr. Simon's mental status findings remained unremarkable throughout his medication management appointments with Dr. Girdhar after the alleged onset date.  (Tr. 296-97, 546, 548, 555, 556, 621, 628, 633, 635.)

### 3.    Function Report

In a January 2021 Function Report, Mr. Simon stated that he lived alone, did not get along with other people, could not lift more than 10 pounds, and could not sit, stand, or walk for more than 10-15 minutes.  (Tr. 231, 235-236.)  His daily activities included: vacuuming, dusting and cleaning the bathroom once a week; reading, preparing simple meals, and washing dishes daily; watching television, and showering; however, he stated that he required assistance or reminders from his cousin to do some of these tasks, like take medicine daily.  (Tr. 232-233, 235).  It was hard to get dressed and to shower because of difficulty putting his hands over his head.  (Tr. 232.)  Mr. Simon did not go outside alone and only left his house to go to medical

---

[2] There are no records suggesting that Mr. Simon initiated psychiatric treatment or counseling with PPBH following the November 2020, February 2021, or September 2021 referrals from Dr. Girdhar.

appointments, the grocery store (once a month for one hour), or pick up his medications.  (Tr. 234.)  Mr. Simon did not drive and had no license.  (*Id*.)  He could pay attention for about 10 minutes and did not follow written or spoken instructions well, but he could handle his finances.  (Tr. 234-236.)  Mr. Simon had no friends, got help from his cousin to stay calm, had once been fired for arguing with a customer who was trying to give him clothing, and did not handle stress or changes in routine well.  (Tr. 235-37.)  He had a hernia that went from his belly button to his breastbone.  (Tr. 238.)

### 4.    Opinion Evidence

#### i.    Consultative Examination

Hassan Kassem, M.D., conducted physical consultative examination on April 22, 2021. (Tr. 567-572.)  Mr. Simon complained of neck and low back pain that caused numbness and tingling down his leg and hindered his ability to sit or stand for more than ten minutes at a time or lift more than ten pounds.  (Tr. 565.)  Mr. Simon also reported that he was independent in his activities of daily living, including dressing, cooking, cleaning, toileting, and driving.  (Tr. 566.) Physical examination revealed: positive straight leg raising bilaterally, right worse than left; gait within normal limits; normal grip and dexterity; and normal range of motion and strength throughout all tested sites.  (Tr. 566-72.)  Dr. Kassem reported that Mr. Simon's effort on examination was good (Tr. 572) and opined that Mr. Simon could "perform less than a normal level of work" (Tr. 567).

#### ii.    State Agency Medical Consultants

On May 11, 2021, state agency medical consultant Lynne Torello, M.D., opined that Mr. Simon had the physical RFC to perform light work with the following limitations: he must be permitted to sit for 5 minutes, as needed and while remaining on task, after every 30 minutes of

standing; he can never climb ladders, ropes, or scaffolds; he must avoid all exposure to unprotected heights and moving mechanical parts; he can frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 95.) This was an adoption of the physical RFC set forth in the prior April 10, 2019 ALJ decision. (*Id.*)

On August 17, 2021, on reconsideration, state agency medical consultant Leon Hudges, M.D., agreed with Dr. Torello's physical RFC findings. (Tr. 103.)

### iii. State Agency Psychological Consultants

On January 17 and 18, 2021, state agency psychological consultant Jaime Lai completed a Psychiatric Review Technique ("PRT") (Tr. 93) and mental RFC assessment (Tr. 95-96). In the PRT, she concluded that Mr. Simon had moderate limitations in understanding, remembering or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself. (Tr. 93.) In the mental RFC, she adopted the mental RFC from the April 10, 2019 ALJ decision, noting that current records suggested a slight improvement in the severity of symptoms overall but symptoms remained variable and supported the same limitations, as follows: Mr. Simon can perform simple, routine, repetitive tasks, but not at a production rate pace; he cannot interact with the public, can occasionally interact with supervisors and coworkers, and can tolerate few changes in a routine work setting. (Tr. 95-96.)

On July 30, 2021, on reconsideration, state agency psychological consultant Courtney Zeune, Psy. D. agreed with Dr. Lai's PRT and mental RFC findings. (Tr. 101, 103-04.)

### C. Hearing Testimony

### 1. Plaintiff's Testimony

At the January 7, 2022 hearing, Mr. Simon testified that he lived in an apartment on the tenth floor, and used an elevator to get to his home and to reach the laundry facilities on the thirteenth floor. (Tr. 37.) He lived alone but his cousin did just about everything for him,

including helping with his laundry, cleaning his bathroom, washing his dishes, doing his grocery shopping (though he went with her occasionally), and driving him where he needed to go. (Tr. 38.) Mr. Simon did not see any other family members or friends and did not have any interactions with his neighbors. (Tr. 38.)

Mr. Simon left school in or after ninth grade and did not complete high school or get a GED. (Tr. 38-39.) He left school because of reading and comprehension issues and entered the workforce in tenth grade. (Tr. 39.)

Mr. Simon was unable to work due to severe pain in his low back that went down his legs to his feet and severe pain in his neck that went down his arms into his hands. (Tr. 40.) It made it hard for him to lift a gallon of milk. (*Id*.) He was taking a nerve pain medication that did not help much, and he was not looking forward to shots (epidural steroid injections), which were the next step in his treatment plan. (Tr. 40-41.) Mr. Simon stopped physical therapy because it was hurting more than it was helping. (Tr. 41.)

Mr. Simon could stand for about 5-8 minutes before needing to sit down, and could walk about 25 feet before needing to take a break. (Tr. 42.) He could hardly walk at all without shoes, and used a walker (which was not prescribed by a doctor) when in his apartment. (*Id*.) It was painful to reach his arms over his head. (Tr. 44.)

With regard to his mental health, Mr. Simon was experiencing depression with crying spells at least two or three times per week and anxiety with panic attacks about every time he left his apartment. (Tr. 44.) He was being treated at Portage Path Behavioral Health where he received psychiatric medication management and thought he would also start counseling. (Tr. 45.) Mr. Simon was hospitalized for attempted suicide when he was a teenager. (Tr. 45-46.)

Because of pain and mental health symptoms, Mr. Simon only slept three to four hours at night and slept in small increments during the day.  (Tr. 46.)  He showered about twice a week and wore clothes that were easy to put on.  (*Id.*)

### 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 50-58.)  She testified that a hypothetical individual of Mr. Simon's age, education, and work experience, with the functional limitations described in the RFC determination, could perform representative positions in the national economy including: mail clerk, photocopying-machine operator, and router.  (Tr. 50-51, 53-54.)   If the person would be absent more than two days a month on an ongoing basis, or off-task more than 10% of the time, that would preclude competitive employment.  (Tr. 52-53.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

16

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV.      The ALJ's Decision

In his January 21, 2022 decision, the ALJ made the following findings:[3]

1.      The claimant had not engaged in substantial gainful activity since October 13, 2020, the application date.  (Tr. 12.)

2.      The claimant had the following severe impairments: lumbar degenerative disc disease, stenosis, spondylosis, and disc displacement/protrusion with radiculopathy; cervical degenerative disc disease, stenosis, spondylosis, and disc bulges with radiculopathy and sciatica; degenerative joint disease and osteoarthritis; tibia-fibular malunion status post remote left ankle fracture and internal fixation with posttraumatic arthritis; peripheral

---

[3] The ALJ's findings are summarized.

neuropathy; obesity; depressive disorder; and anxiety and social anxiety disorder. (*Id.*)

3.  The claimant did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13.)

4.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: standing and/or walking would be limited to thirty-minute intervals, after which he must be permitted to sit for five minutes, but the claimant would remain at the work station and on task when shifting positions. He can never climb ladders, ropes, or scaffolds. He can frequently balance, and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant can frequently reach, handle, and finger with the bilateral upper extremities. He must avoid concentrated exposure to extreme cold and vibrations, and avoid all exposure to hazards, including unprotected heights, moving mechanical parts, and commercial driving. He can perform simple, routine, and repetitive tasks but cannot perform tasks that require a high production rate pace, such as assembly line work. He can interact on an occasional basis with supervisors and coworkers in a non-public setting, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others. The claimant can respond appropriately to only occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation. (Tr. 14-15.)

5.  The claimant has no past relevant work. (Tr. 18.)

6.  The claimant was an individual closely approaching advanced age on the application date. (*Id.*)

7.  The claimant has a limited education. (*Id.*)

8.  Transferability of job skills is not material to the determination of disability. (*Id.*)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 19.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date on October 13, 2020, through the date of the decision on January 21, 2022. (*Id.*)

## V.    Plaintiff's Arguments

Mr. Simon presents one assignment of error, that the ALJ erred by failing to follow SSR 16-3p and SSR 96-8 in his assessment of subjective symptom reporting.  (ECF Docs. 11, 15.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**    **Sole Assignment of Error: Whether ALJ Appropriately Considered Subjective Complaints under SSR 16-3p and SSR 96-8p**

Mr. Simon argues that the ALJ's analysis of his subjective complaints violated Social Security Rulings 16-3p and 96-8p and failed to build a logical bridge between the evidence and the result because the ALJ found his subjective complaints only "partially consistent" with the evidence but "cited scant support . . . some of which is contradictory to what is in the record and completely ignored the substantial amount of evidence that supported Mr. Simon's claims." (ECF Doc. 11, p. 16.) The Commissioner responds that "[a] review of the record, decision, and authorities demonstrates that substantial evidence supports the ALJ's decision" to afford Mr. Simon an RFC of a "restricted range of light work." (ECF Doc. 14, p. 7, 8.) The Court will address Mr. Simon's arguments regarding his physical and mental impairments separately.

20

### 1.     Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakaz*i, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability) ("SSR 16-3p").

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 15-16), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and

other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. 404.1529(c)(3).

SSR 96-8p further advises that an ALJ's RCF analysis should discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996).  Specifically:

> In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:
>
> - Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;
>
> - Include a resolution of any inconsistencies in the evidence as a whole; and
>
> - Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

SSR 96-8p, 61 Fed. Reg at 34478.

## 2.  Whether ALJ Appropriately Addressed Physical Symptoms

In assessing Mr. Simon's physical impairments, the ALJ acknowledged his complaints that he could only sit, stand, or walk for limited periods, and could only lift ten pounds (Tr. 15), and found that his physical impairments could cause the reported symptoms, but ultimately concluded that Mr. Simon's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical and other evidence (Tr. 15-16). In support of this conclusion, the ALJ discussed Mr. Simon's treatment records, evaluated the persuasiveness of the medical opinion evidence (Tr. 16-18), and then explained:

> With respect to the claimant's alleged symptoms and limitations, I find such assertions only partially consistent with the evidence. The claimant had ongoing neck and back pain that he said radiated into his left arm and right leg. He demonstrated decreased L5 sensation on the left, but otherwise normal sensation, intact strength, normal reflexes, and a normal gait. The claimant had continued pain, but his condition appeared to stabilize generally with medication. He did not

22

> seek or require more invasive treatment. Such facts suggest that the claimant could perform the reduced range of light work described in the residual functional capacity.

(Tr. 17-18.)  The ALJ then adopted a light exertional RFC that allowed for Mr. Simon to sit for five minutes after each thirty minutes of standing or walking, limited his obligations to climb, balance, stoop, kneel, crouch, crawl, reach, handle, or finger, and restricted his exposure to cold, vibrations, and hazards.  (Tr. 14-15.)  The ALJ specifically noted in his opinion analysis that "the record showed that the claimant's condition was largely stable since the previous decision," but that the ALJ had "further reduced the postural functions in the [RFC]" due to "some advancement of the claimant's pain."  (Tr. 17.)

Mr. Simon argues that the ALJ failed to adequately explain how his reported symptoms were inconsistent with the evidence, cited "scant support . . . some of which is contradictory to what is in the record," and "completely ignored the substantial amount of evidence that supported" his claims.  (ECF Doc. 11, p. 16.)  As to his physical impairments, he asserts:

> The ALJ stated that the records demonstrated decreased L5 sensation on the left but otherwise normal sensation, intact strength, normal reflexes, and normal gait [].  However, physical examination revealed weakness and decreased range of motion consistent with diagnoses of cervical and lumbar radiculopathy [].

(Id. (citing Tr. 17, 292).)  But aside from that single physical therapy record noting weakness and a decreased range of motion (Tr. 292), Mr. Simon does not identify specific inconsistencies in the evidence that he asserts the ALJ failed to address.  Instead, he generally discusses medical records relating to his pain complaints and his spinal imagery (ECF Doc. 11, pp. 16-18), without explaining what "substantial amount of evidence" the ALJ "completely ignored" (id. at p. 16).

The Commissioner argues in response that the ALJ adequately considered the subjective complaints, medical evidence, and other evidence, and provided a detailed explanation of his findings that addressed inconsistencies between the allegations and the evidence.  (ECF Doc. 14,

p. 8.)  As to the sole record cited by Mr. Simon as inconsistent with the ALJ's observation that

he "demonstrated decreased L5 sensation on the left, but otherwise normal sensation, intact

strength, normal reflexes, and a normal gait" (Tr. 17)—a May 2019 physical therapy record that

noted "[t]he current impairments identified include: weakness, decreased AROM" (Tr. 292)—the

Commissioner argues the cited examination is not relevant because it is dated "approximately 15

months prior to Plaintiff's alleged onset date" (ECF Doc. 14, p. 8).  The Court further observes

that the relevant examination did not include a manual muscle test "secondary to patient request

not to be touched," so the notation of "weakness" was not based on any physical examination

findings.  (Tr. 291-92.)  The Court agrees that the ALJ's obligation to resolve inconsistencies

under SSR 96-8p did not require him to specifically account for the "weakness" noted in an

outdated physical therapy assessment before observing, consistent with the relevant medical

records, that Mr. Simon's physical examination findings reflected "intact strength."  (Tr. 17.)

As to the other records summarized in Mr. Simon's brief (ECF Doc. 11, pp. 16-18), a

review of the ALJ decision reveals that he considered many of the same findings (*see* Tr. 16-17).

Although Mr. Simon argues that the ALJ ignored "a substantial amount of evidence" (ECF Doc.

11, p. 16), he does not identify the evidence that was allegedly ignored, and an ALJ need not

discuss every piece of evidence to render a decision supported by substantial evidence.  *See*

*Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky*

*v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  It is also not

this Court's role to scour the record for evidence to support Mr. Simon's arguments.  *See Hollon*

*v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the

particular points that [Plaintiff] appears to raise in her brief on appeal."); *McPherson v. Kelsey*,

24

125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

The ALJ did not discuss Mr. Simon's six PT sessions in May and June of 2019 (*see* ECF Doc. 11, pp. 16-17), but that treatment occurred 15 months before the October 2020 alleged onset date and the findings in those records do not materially conflict with the ALJ's observation, based on the treatment records during the alleged disability period, that Mr. Simon's neck and back pain appeared to stabilize generally with medication, and that Mr. Simon did not seek more invasive treatment. (Tr. 17-18.) As to the ALJ's finding that Mr. Simon's conditions "appeared to stabilize generally with medication," this finding was supported by the medical records described and cited by the ALJ. (*See* Tr. 16 (citing Tr. 451, 454, 545-57, 628, 632-35), Tr. 17 (citing Tr. 586-91).) And as to the finding that Mr. Simon "did not seek or require more invasive treatment" (Tr. 17), this finding is also consistent with the medical records (*see, e.g.,* Tr. 457 (deferring epidural steroid injections), Tr. 582 (same), Tr. 594 (same), Tr. 606 (same), Tr. 665 (same)). Courts have long recognized that treatment limited to medications alone is appropriately considered in assessing the impact of pain. *See Fleischer v. Astrue*, 774 F. Supp. 2d 875, 880 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1529). The Court therefore concludes that the ALJ did not fail to resolve inconsistencies in the record pursuant to SSR 96-8p when he analyzed Mr. Simon's physical impairments.

For the reasons set forth above, the Court finds that the ALJ complied with the regulatory standards articulated in SSR 16-3p or SSR 96-8p when he analyzed Mr. Simon's subjective complaints regarding his physical impairments, and further finds that Mr. Simon has not met his burden to show that the ALJ mischaracterized the record, ignored relevant evidence, failed to provide a reasoned rationale, or made findings that lacked the support of substantial evidence.

### 3.      Whether ALJ Appropriately Addressed Mental Symptoms

In assessing Mr. Simon's mental impairments, the ALJ acknowledged his complaints that he did not get along with others, felt overwhelmed going outside, and had difficulty concentrating, following instructions, completing tasks, and handling stress and changes (Tr. 15), and found that his mental impairments could cause the reported symptoms, but ultimately concluded that Mr. Simon's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical and other evidence (Tr. 15-16). In support of this conclusion, the ALJ discussed Mr. Simon's treatment records, evaluated the persuasiveness of the medical opinion evidence (Tr. 16-18), and then explained:

> In terms of the claimant's mental conditions, he had ongoing mood and anxiety symptoms, including periodic complaints of being isolated. Nevertheless, the claimant displayed generally normal affect, cooperative behavior, and no thought disorder. He did not have any ongoing cognitive impairment. Accordingly, he was able to perform simple tasks in the relatively static and socially limited environment of the residual functional capacity.

(Tr. 18.)  The RFC adopted by the ALJ limited Mr. Simon to simple, routine, repetitive tasks, not at a high production rate pace, in a non-public setting, with only occasional, superficial contact with supervisors and coworkers, and only occasional workplace changes.  (Tr. 15.)  The limitation to "superficial contact with others" was specifically added based on "updated evidence" regarding Mr. Simon's "social anxiety limitations."  (Tr. 17.)

Mr. Simon argues that the ALJ failed to adequately explain how his reported symptoms were inconsistent with the evidence, cited "scant support . . . some of which is contradictory to what is in the record," and "completely ignored the substantial amount of evidence that supported" his claims.  (ECF Doc. 11, p. 16.)  As to his mental impairments, he asserts:

> With respect to Mr. Simon's mental health issues, the ALJ stated that Mr. Simon's complaints were partially consistent because he generally displayed normal affect, cooperative behavior, no thought disorder, and ongoing cognitive impairment [].  However, multiple medical records demonstrated significant functional limitations.

26

(*Id.* at p. 18 (citing Tr. 18).)  Mr. Simon does not identify specific inconsistencies in the evidence

that he asserts the ALJ failed to address.  Instead, he generally discusses medical records relating

to his mental health treatment (*id.* at pp. 18-19), without explaining what "substantial amount of

evidence" the ALJ "completely ignored" (*id.* at p. 16).  It is observed that the evidence described

in Mr. Simon's brief relates primarily to the 19-month period before his October 2020 alleged

onset date.  (*Id.* at pp. 18-19 (citing Tr. 301 (9/16/20), 305 (7/15/20), 321 (2/12/20), 326

(1/15/20), 339 (10/5/19), 344 (9/3/19), 347 (8/13/19), 350 (7/30/19), 360 (5/24/19), 364

(4/23/19), 375 (1/10/19), 545 (3/10/21), 551 (1/21/21), 621 (9/15/21).)  In discussing the three

cited records from within the alleged disability period, Mr. Simon said only that his anxiety

leaving the house "continued throughout the record where he related problems leaving his home

and the actual symptoms suffered when he actually left."  (*Id.* at p. 19 (citing Tr. 545, 551, 621).)

While the ALJ did not explicitly discuss the mental health treatment records preceding

alleged onset date, Mr. Simon has not offered any argument as to why it was error for the ALJ

*not* to discuss those earlier records.  The Court is aware of no material information from the

earlier records that would deprive the ALJ's reasoning of the support of substantial evidence.

Further, Mr. Simon has not identified evidence that is inconsistent with the ALJ's finding that he

"displayed generally normal affect, cooperative behavior, and no thought disorder" and "did not

have any ongoing cognitive impairment" (Tr. 18), and the Court is aware of none.  As noted in

Sections II.B.1.ii. and II.B.2.ii., *supra*, the mental status findings by Mr. Simon's mental health

providers were unremarkable both before and throughout the alleged disability period.  The

record is also consistent with the ALJ's earlier observation that Mr. Simon was taking several

medications (Tr. 16 (citing Tr. 555)) and that "[h]is condition was stable into the spring" (*id.*

(citing Tr. 545-47, 628, 632-36)).  And the ALJ adopted a mental RFC with significant

limitations, including a new limitation based on Mr. Simon's alleged social anxiety symptoms. (Tr. 17.)  The Court therefore finds the ALJ did not fail to resolve inconsistencies in the record pursuant to SSR 96-8p when he analyzed Mr. Simon's mental impairments.

For the reasons set forth above, the Court finds the ALJ complied with the regulatory standards articulated in SSR 16-3p or SSR 96-8p when he analyzed Mr. Simon's subjective complaints regarding his mental impairments, and further finds that Mr. Simon has not met his burden to show that the ALJ mischaracterized the record, ignored relevant evidence, failed to provide a reasoned rationale, or made findings that lacked the support of substantial evidence. The Court therefore finds Mr. Simon's sole assignment of error to be without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 3, 2024

          */s/Amanda M. Knapp*
          AMANDA M. KNAPP
          United States Magistrate Judge